mandate under which he was arrested was not authorized by an order of the court, or by a provision of law, and was therefore void, and his arrest thereunder void. We therefore decide and hold that the order adjudging the relator in contempt and imposing the fine against him and his arrest and the order of commitment were, and each is, void, and that the relator is unlawfully imprisoned and restrained of his liberty; and a final order discharging him forthwith is directed, with his costs and disbursements of this proceeding, to be duly taxed against Mrs. Gardner.

Ordered accordingly.

## DICKINSON v. BLAKE et al.

(Supreme Court, Appellate Division, Third Department. December 7, 1906.)

1. ESTOPPEL—MORTGAGES—EXTENT.

> Testator, who died in 1879, gave the use of his property to his wife for life, remainder to his three children. In 1892, in order to raise money for the widow, each of the remaindermen, who were present at a family meeting, consented to a mortgage on the remaining property, knowing that the life estate was of insufficient value to obtain the necessary loan. The mortgage did not, in fact, cover the remainder, but the remaindermen's attorney induced the mortgagee to believe that it was the first lien on the entire property, and the attorney intended it so to be. *Held*, that the remaindermen were estopped to deny that the mortgage covered the remainder.

> [Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Estoppel, §§ 218, 228, 234.]

Appeal from Trial Term.

Action by Foster Dickinson by Charles A. Dickinson, his guardian ad litem, against Leonora Blake and others. Complaint dismissed, and plaintiff appeals. Affirmed.

The following is the opinion of John M. Kellogg, at Trial Term:

By the will of Bentley J. Harris, who died in May, 1879, he gave the use of his property to his wife, Phœbe, for her life, and the remainder to his children, Addie A., Leonora, and Carmi. In 1892 the mother was in a critical condition, and it was necessary for her to submit to an expensive and dangerous surgical operation. She and her three children, the sons-in-law and daughter-in-law, were present with the doctors discussing the expense, and whether money could be furnished to procure the operation. She had no other property except her interest in the house and lot in question, and was then living with one of her daughters. Her age does not definitely appear, but the eldest child was born in 1857. It was then in fact stated by her and her children, in the presence of Charles Dickinson, the husband of Addie A., that the only way of obtaining the money was by a mortgage of the house and lot. Each of the children said they consented to it, and urged that it be done, as her life must be saved even though it took all the property. Haste was necessary, and Charles Dickinson applied to one Willard to obtain the money upon mortgage. They went to one Keefe, the attorney of Willard. Dickinson stated that a search was not necessary; that the title was known, and a mortgage was prepared for Mrs. Harris to execute. She executed it, the money was furnished, and the operation had. Mrs. Harris lived until October, 1898, and in 1901 the mortgage was foreclosed, treating the property as the property of Mrs. Harris, and making her children, and the descendants of those deceased, parties to the action as having interests subsequent to the mortgage. The property was sold, a surplus remained, and in surplus money proceedings

the daughter Leonora Blake, as administratrix of the mother and personally, obtained enough to pay the unpaid debts of the estate, and one-third of the remainder she received herself. This proceeding treated the property sold as the property of Mrs. Harris. The husband of the said Leonora purchased the property at such foreclosure sale. The daughter Addie A. Dickinson died before the foreclosure, leaving two children, one of whom is the plaintiff and the other a defendant, both of whom were parties to the foreclosure action. It appears affirmatively that the son Carmi and the daughter Leonora in fact knew at the time and prior to the conversation about the mortgage and the execution of the mortgage that the mother only had a life estate and that they each owned an undivided one-third of the remainder. The daughter Addie A. was then about 36 years of age. The will was probated soon after the death of the testator, and the family knew its terms, and I find as a fact that at the time of the conversation about the mortgage, and prior to the mortgage, all of the children of Mrs. Harris knew that she only had a life estate in the property, the children having the remainder, and that the life estate was not a sufficient interest in her precarious health upon which to raise $400, the amount necessary for the operation, and that they each intended that their interest in the property should be mortgaged to raise the money for this operation, and they intended that Mr. Dickinson, the son-in-law, should negotiate and arrange the loan, and he was their agent when he applied to Mr. Willard for the loan of the money. They did not know as a matter of law but the mother could execute the mortgage and bind the real estate, but they did know that the mortgage was to be a lien upon the real estate and cover their interests therein. The mortgagee, Willard, and his attorney, at the time of making said loan, believed the mortgage was valid and effectual, and were induced by the said Dickinson to believe that it was a first lien upon the entire property, and he intended to and caused them to so believe. It would not now be equitable to allow either of the children to deny that the mortgage did in fact cover the entire property, or to deny that Mr. Dickinson fairly represented them in making the loan, as they intended that their interest should be covered by the mortgage. What he did in making the loan and mortgage should be treated as their acts. The mistake made by Mr. Dickinson, who was their agent in doing the business, should not prejudice the mortgagee. They should be treated as doing what they intended to do, and the mortgage should be given the effect which they expected it to have when it was agreed by them it should be made. They are estopped from denying that the mortgage became and was a lien upon their interest in the property. To constitute an equitable estoppel, it is not necessary that there should be a fraudulent intent; but if the parties have caused another person to do an act relying upon their conduct, which he would not otherwise have done, they cannot now be permitted to repudiate such conduct. The injury to the mortgagee is just as great whether the children of Mrs. Harris knew at the time they consented to the mortgage that they were the owners of the property or not. They did consent to it, and were parties in bringing it about, and, if they did not know, they were clearly negligent in not knowing. In any event, it is inequitable to allow them now to deny it, considering the transaction as it occurred. Trustees, etc., v. Smith, 118 N. Y. 634, 23 N. E. 1002, 7 L. R. A. 755; Mattes v. Frankel, 157 N. Y. 603, 32 N. E. 585, 68 Am. St. Rep. 804; Trenton Banking Co. v. Duncan, 86 N. Y. 221 (229).

"The rule has sometimes been stated as though it were universal, that an actual knowledge of the truth is always indispensable. It is, however, subject to so many restrictions and limitations as to lose its character of universality. It applies in its full force only in cases where the contract creating the estoppel consists of silence or acquiescence. It does not apply where the party, although ignorant or mistaken as to the real facts, was in such a position that he ought to have known them, so that knowledge will be imputed to him. In such case, ignorance or mistake will not prevent an estoppel. Nor does the rule apply to a party who has not simply acquiesced, but who has actually interfered by acts or words, and whose affirmative conduct has thus misled another. Finally, the rule does not apply, even in cases of mere acquiescence, when the ignorance of the real facts was occasioned by culpable negligence." Pomeroy's Eq. Jur. (3d Ed.) § 809, p. 1437.

The plaintiff and the parties similarly situated, therefore, are estopped from denying that the mortgage was a first lien upon the entire property, and from denying that their interests in the property became and were subsequent to the mortgage. The mortgage binding their interests was therefore properly foreclosed and is valid, and the mortgage and foreclosure are valid and effectual against them. What may be the liability, if any, of any of the parties with reference to the drawing of any such surplus money, is not now here before the court, and is not now determined. The complaint should therefore be dismissed, with costs.

Argued before PARKER, P. J., and SMITH, CHESTER, and COCHRANE, JJ.

James H. Bain, for appellant.

D. J. Sullivan, King & Angell, Scott & Hamele, and Willoughby L. Sawyer, for respondents.

PER CURIAM. Judgment affirmed, with costs, on the opinion of Justice John M. Kellogg at Trial Term. All concur, except PARKER, P. J., dissenting.

---

(51 Misc. Rep. 483.)

In re PRITCHARD. In re TRUXES. In re STONER. In re HOLMES.

(Supreme Court, Special Term, Erie County. October, 1906.)

MANDAMUS—POLICE BOARD—REINSTATEMENT OF OFFICERS.

The power to detail patrolmen for detective duty in the city of Buffalo is by the charter of such city vested exclusively in the superintendent of police, who also has power to revoke such details, so that an application for mandamus to compel the police board to reinstate relators as detective sergeants will be denied.

Applications by one Pritchard, one Truxes, one Stoner, and one Holmes for writs of mandamus against the police board of Buffalo. Applications denied.

George W. Wheeler, for relators.
S. F. Moran, City Atty., opposed.

POUND, J. The charter of Buffalo (Laws 1901, p. 172, c. 105, § 191) provides that:

"The superintendent [of police] shall detail for detective duty such patrolmen * * * as he shall from time to time select. The patrolmen so detailed shall compose the detectives of the force and during the time said patrolmen are detailed for detective duty they shall have the rank and pay of sergeants and be known as detective sergeants."

Relators, who are regularly appointed patrolmen of the police force of Buffalo, had been, prior to April 13, 1906, detailed as detective sergeants, and had for some time been acting as such; but, on said date, their details were summarily revoked by an order of the acting superintendent of police. The charter provides (section 192) that members of the police force shall be liable to reduction in rank only upon charges and after a hearing.

It is plain, from the language of the charter, that a distinction exists between an appointment and a detail, and that the detective sergeants are not on the same footing with the other officers of the force. The